UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

COMMUNITY HEALTH CENTER, INC.  :      CIVIL ACTION NO. 302CV761 (CFD)
    *Plaintiff*              :

                  :

    v.                :

                  :

PATRICIA WILSON-COKER, J.D.,
M.S.W., COMMISSIONER OF THE
STATE OF CONNECTICUT,
DEPARTMENT OF SOCIAL SERVICES  :
    *Defendant*         :      December 26, 2003

**MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT**

**I. INTRODUCTION**

This memorandum is in opposition to the Plaintiff's Motion for Summary Judgment.

The Department should prevail as a matter of law.  The Department will demonstrate:  (1) the

Eleventh Amendment bars the recovery of retrospective monetary relief, hence the plaintiff's

claim for $78,000.00 already recouped by the Department must be dismissed; (2)  the plaintiff is

not entitled to be reimbursed for the cost of "case management" services pursuant to 42 U.S.C. §

1396a(bb) as a meeting with a case manager does not constitute a "visit" as defined by federal

law or the Department's State Plan amendment 01-002; (3) the plaintiff improperly billed the

Department for psychotherapy services allegedly performed by a case manager who was not

qualified or trained to perform such services.  Based upon the factual issues in dispute in this

case which will be more fully explored in this brief, defendant respectfully submits that this

matter cannot be disposed of by summary judgment.

## II. BACKGROUND

This case involves an adjustment to the audit findings of the Department regarding its audit of Medical Assistance claims paid during the period January 1, 1999 to December 31, 2000. Based upon a determination by the Department that the plaintiff, Community Health Center, Inc., was paid for services that were not rendered, the Department deducted approximately $78,000.00 from future payments to the plaintiff. The plaintiff alleges these paid claims were proper in that the services that were being provided, case management services, are services for which they are entitled to be reimbursed. In addition, the plaintiff argues that, based upon recently enacted federal statutory changes, they are entitled to recover 100% of their reasonable costs and that said costs in this case are reasonable. The Department argues that the plaintiff is not entitled to be paid for case management services as a separate, stand alone item of service as the cost of case management services is already included in the plaintiff's overall rate. Second, in this case, the plaintiff is not entitled to bill the Department for these services as the Department was billed for "psychotherapy" services which were rendered by a person not qualified to provide such services.

The plaintiff is a non-profit, tax-exempt primary health care clinic that receives grant funds under Section 330 of the Public Health Service Act, 42 U.S.C. § 254b. As a recipient of grant funds under 42 U.S.C.§ 254b, CHCI is a Federally-Qualified Health Center or "FQHC" under both the Medicare and Medicaid programs. 42 U.S.C. §§1395x(aa)(4) (Medicare) and 1396d(u) (Medicaid). Medicaid was established in 1965 as Title XIX of the Social Security Act, codified at 42 U.S.C.§ 1396 et seq., to assist states in the provision of adequate medical care to

eligible needy persons. The Department is responsible for the administration of the State Medicaid Program and General Assistance Program. In addition, the Medicaid Program is partially funded by the Federal Government and must comply with the regulations of the U.S. Department of Health and Human Services. Providers enrolled in either the General Assistance Program or the Medicaid Program must comply with all Connecticut Medicaid regulations (See Exhibit 1).

Reimbursement by the State for medical services provided to persons eligible for Medicaid or General Assistance is available when the services are provided in accordance with State statutes and regulations and policies promulgated by the Department. A state elects to participate in the Medicaid program by filing a state plan. Within broad national guidelines contained in federal law, each state (through its state plan) establishes its own eligibility standards; determines the type, amount, duration, and scope of services; sets the rate of payment for services; and administers its own program. See 42 U.S.C.§ 1396a. Covered services to eligible beneficiaries are paid for by the state; federal participation is provided by grants from the federal government to the states. 42 U.S.C.§ 1396b.

Federal law requires that state Medicaid plans cover services rendered by FQHC's. 42 U.S.C.§§1396a(a)(10)(A) and 1396d(a)(2)(C). FQHC's are required to provide an array of services and must serve all members of the community without regard for their ability to pay. 42 U.S.C.§ 254b. FQHC's must offer "required primary health services" which consists of basic health services (including but not limited to family medicine, internal medicine, pediatrics, obstetrics or gynecology); referrals to providers of medical services and other health-related services; patient case management services and other services designed to assist health center patients in establishing eligibility for and gaining access to Federal, state, and local programs that

provide or financially support the provision of medical, social, educational, or other related

services; services that enable individuals to use the services of the health center; and education of

patients and the general population served by the health center regarding the availability and

proper use of health services. 42 U.S.C. § 254b(b)(1)(A)(i)-(v).  FQHC's are also required to

provide "additional health services" pursuant to 42 U.S.C.§ 254b(B)(2). "Additional health

services" means services that are not included as required primary health services and that are

appropriate to meet the health needs of the population served by the health center. They include

environmental health services, which includes the detection and alleviation of unhealthful

conditions associated with water supply; sewage treatment, solid waste disposal; rodent and

parasitic infestation; field sanitation; and housing.  42 U.S.C. § 254b(b)(2)(A).

Prior to  January 1, 2001, the Medicaid statute required cost-based reimbursement for

FQHC services.  42 U.S.C.§ 1396a(aa).  In December of 2000, Congress enacted the Benefits

Improvement and Protection Act of 2000 ("BIPA"), Pub. L. No. 106-554 (Dec. 21, 2000).  The

BIPA replaced cost-based reimbursement with a prospective payment system, codified at 42

U.S.C.§ 1396a(aa)(2).  In the shift from cost-based reimbursement to the prospective payment

system, Congress required that the new per-visit rate be calculated on the basis of what the

FQHC received previously under the old cost-based system.  The Act provides in pertinent part:

> The State plan shall provide for payment for such services in an amount
> (calculated on a per visit basis) that is equal to 100 percent of the average of the
> costs of the center or clinic of furnishing such services during fiscal years 1999
> and 2000 which are reasonable and related to the cost of furnishing such services,
> or based on such other tests of reasonableness as the Secretary prescribes in
> regulations under [Medicare], or, in the case of services to which such regulations
> do not apply, the same methodology used under [Medicare], adjusted to take into
> account any increase or decrease in the scope of such services furnished by the
> center or clinic during fiscal year 2001.

4

To conform to the new FQHC legislation, the Department filed an amendment with the Center for Medicare and Medicaid Services ("CMS"), an agency created by Congress and charged with administering the Medicaid program (See Exhibit 1). The Department amended its regulations to implement a new regulation dealing with payment of FQHC's. The regulations, specifically Section 17b-262-661 (4), defines "Billable Service Visits" as "a face-to-face encounter between the patient and health practitioner during which a primary health, mental health or dental service is rendered whether such encounter is billed or not." The Department's Medical Services Policy regulations further define the provision of mental health services by mental health clinics (See Exhibit 2). Section 171.1, Mental Health Clinics, states in pertinent part: "Covered in this section are all independent mental health facilities, private and non-profit, which are under the direction of a licensed physician or psychiatrist and staffed by psychiatrists, psychologists, social workers and other such allied health professionals and paraprofessionals providing mental health services that are designed to: (a) effectively decrease the prevalence and incidence of mental illness, emotional disturbance and social dysfunction; and (b) promote mental health in individuals and groups." Section 171.1B.1 states in pertinent part: "The clinic is staffed by physicians, psychiatrists, and allied health professionals who are directly involved in the facility's programs. The allied health professionals provide services under the direction of a physician or psychiatrist who is a licensed practitioner performing within the scope of his/her practice."

The regulations further define the phrase "by or under the direction of a physician or psychiatrist" to mean "the mental health clinic's services may be provided by allied health professionals whether or not a physician or psychiatrist is physically present at the time that medical or medically-related services are provided. The physician or psychiatrist (a) must

assume professional responsibility for the services provided; (b) must assure that the services are medically appropriate (i.e., the services are intended to meet a medical or medically-related need, as opposed to needs which are clearly only social, recreational, or educational); and (c) need not be on the premises, but must be readily available, meaning within fifteen (15) minutes."

Section 171.1D, entitled "Eligibility" states "payment for clinics providing mental health services are available for all persons eligible for Medicaid, subject to the conditions and limitations which apply to these services." Section 171.1E, entitled "Services Covered and Limitations" states in pertinent part: "Except for limitations and exclusions covered below, the Department will pay for mental health services which conform to accepted methods of diagnosis and treatment, but will not pay for anything of an unproven, experimental, or research nature or for services in excess of those deemed medically necessary by the Department to treat the recipient's condition or for services not directly related to the recipient's diagnosis, symptoms or medical history." Among the covered treatment services are individual psychotherapy, group psychotherapy, family therapy and methadone maintenance treatment programs."

The Office of Quality Assurance within the Department is responsible for auditing payments to providers for claimed medical services rendered under the Medicaid and General Assistance Program. Regs. Conn. State Agencies § 17-134d-76. The audit of paid claims and the related medical and billing records is directed to a determination that: (1) the services, which were billed to the Department, were actually rendered to an eligible recipient and were medically necessary; (2) the billings to the Department properly reflect the services rendered by the Provider; (3) original documentation was maintained to evidence the performance of the services billed; (4) the Provider appropriately adhered to State statutes and regulations and policy requirements promulgated by the Department; (5) third party insurance was properly billed and

the State's liability appropriately billed and paid; and (6) the Provider appropriately adhered to all terms and conditions of its Provider Agreement with the Department (Affidavit of James Wietrak, Director of the Office of Quality Assurance as Exhibit 3).

The audit of the plaintiff was predicated on a review of claims paid during the period January 1, 1999 through December 31, 2000. The total Medical Assistance payments during this period amounted to $406,326.00. The examination consisted of the review of medical records supporting the services billed to the Department. It also encompassed the review of the orders by physicians for the services. The Department's files were reviewed for pertinent information as well as other related records maintained by the Provider. A sample of 93 claims paid during the audit period were reviewed. This sample was chosen by computer using a random sampling method from a total universe of 3,518 claims. Errors found in the sample were extrapolated to the universe using mean per unit estimate. The amount of error was calculated for each sample claim. The average error per sample claim was then calculated. The average error was multiplied by the total number of paid claims to determine the extrapolated amount (Exhibit 4).

In four instances of the sample claims audited, the medical records disclosed social services performed by a person other than a physician, psychiatrist or an allied health professional. In these instances, a case manager provided the services (See Exhibit 3). A review of the treatment plans disclosed that a physician or psychiatrist did not sign the treatment plan. The audit cited Medical Services Policy for Mental Health Clinics § 171.1B.II, which requires that mental health services provided by an allied health professional be provided by or under the direction of a physician or psychiatrist. The audit also cited § 171.1BIII, Allied Health Professional which states: "An allied health professional or paraprofessional is an individual, employed in a clinic, who is qualified by special education and training, skills and experience in

providing mental health care and treatment. Services may be provided by, but not limited to, psychologists, psychiatric nurses, psychiatric social workers and mental health counselors."

On September 18, 2001, the Department issued a draft report to the plaintiff regarding the audit of Medical Assistance paid claims for the period January 1, 1999 to December 31, 2000.

The Department issued its final audit report in this case on October 31, 2001 (Letter of John McCormick, Office of Quality Assurance as Exhibit 5 ). Representatives of the Department and the plaintiff met to discuss the audit on December 21, 2001. On April 17, 2002, the Department informed the plaintiff that the audit adjustment of $78,508.95 would stand. Shortly thereafter, the Department recovered the $78,000.00 from future payments to the plaintiff. The plaintiff initiated this action in May of 2002.

### III. STANDARD OF REVIEW ON MOTIONS FOR SUMMARY JUGDMENT

Summary judgment is appropriate if there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. Caldarola v.Calabrese, 298 F.3d 156, 160 (2d Cir. 2002). Further, "in ruling on a motion for summary judgment, the non-moving party's evidence is to be believed, and all justifiable inferences are to be drawn in that party's favor." Hunt v. Cromartie, 526 U.S. 541, 552 (1999); see also Lane Capital Mgmt., Inc. v. Lane Capitol Mgmt., Inc., 192 F.3d 337, 343 (2d Cir. 1999 "If, as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper." Gummo v. Village of Depew, New York, 75 F.3d 98, 107 (2d Cir. 1996).

The plaintiff's Motion for Summary Judgment must be dismissed as there exists genuine issues of material fact that are in dispute. First, plaintiff claims that it is entitled to bill for case

management visits as separate billable visits and that the failure to count these visits will result in

the plaintiff not being able to cover its costs for case management.  The defendant contends that

the plaintiff is in fact compensated for its case management costs, as said costs have been

calculated into their overall rate.  Second, plaintiff contends that, because case management is a

service it is required to provide by federal law as well as state regulations, the plaintiff is entitled

to bill for such services on a per patient visit basis.  The defendant contends that FQHC's,

including the plaintiff, were issued approved rates which included those services the plaintiff

could bill the Department. The plaintiff's billing is limited to these services.  Third, the plaintiff

contends that in this case, the case manager was working closely with staff clinicians in

providing services to the clients referenced in the audit, thus making it appropriate to bill for her

services.  The defendant contends that the plaintiff billed the defendant for services that the case

manager in question was not qualified to provide, and in fact did not provide.  It was thus

appropriate to adjust the amount of paid claims to reflect this inappropriate billing.

Based upon these factual contentions, the Court must conclude that genuine issues of

material fact exist so as to make the granting of plaintiff's Motion for Summary Judgment

inappropriate.

III.  **THE CLAIM FOR RETROSPECTIVE DECLARATORY OR INJUNCTIVE
RELIEF SHOULD BE DISMISSED AS IT IS PROHIBITED BY THE ELEVENTH
AMENDMENT**

In the Relief Requested section of plaintiff's Amended Complaint, ¶ 2 states "[T]o order

defendant to reimburse CHCI for the costs of providing case management services and to

develop CHCI's base PPS rate in such a manner that includes all Medicaid covered services

provided by CHCI in fiscal years 1999 and 2000, as required by Federal law."  Specifically, the

plaintiff is seeking reimbursement of the $78,508.95 already recovered by the Department. This

is precisely the type of retrospective relief, in this case monetary damages, that is barred by the Eleventh Amendment.

The Eleventh Amendment to the United States Constitution provides: "[T]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." To the extent the plaintiff seeks money damages against the defendant Commissioner in her official capacity, dismissal of this claim is proper because such a suit is essentially one against the State of Connecticut, which is barred. See Ford v. Reynolds, 316 F.3d 351, 354 (2d Cir. 2003); see also Sundwall v. Leuba, No. 3:00-CV-1309, 2001 U.S. Dist. LEXIS 737, at *9 (D. Conn. Jan. 23, 2001). "States-state officers, if sued in their official capacities for retrospective relief—are immunized by the Eleventh Amendment from suits brought by private citizens in federal court and, in any event, are not 'persons' subject to suit under [section] 1983." K&A Radiological Tech. Servs., Inc. v. Comm'r of the Dep't of Health, 189 F.3d 273, 278 (2d Cir. 1999) (citing Will v. Michigan Dep't of State Police, 491 U.S. 58, 70-71 (1989). In Edelman v. Jordan, 415 U.S. 651, 664-68 (1974) the Supreme Court emphasized that the Eleventh Amendment bars some forms of injunctive relief against state officials for violations of federal law. See Pennhurst State School & Hospital v. Halderman, 465 U.S. 89, 102 (1984). In particular, Edelman, supra, held that, when a plaintiff sues a state official alleging a violation of federal law, the federal court may award an injunction that governs the official's future conduct, but not one that awards retroactive monetary relief. 415 U.S. at 666-67. Pennhurst, 465 U.S. at 102-03. "Such a suit would not be one against the State since the federal-law allegation would strip the state officer of his official authority. Nevertheless, retroactive relief [is] barred by the Eleventh Amendment." Pennhurst, 465 U.S. at

103; see also <u>Kentucky v. Graham</u>, 473 U.S. 159, 165-67 (1985) (suit for damages against state officer in official capacity is barred by Eleventh Amendment).

This action was brought against Commissioner Patricia Wilson-Coker in her official capacity pursuant to 42 U.S.C § 1983. Consequently, the plaintiff cannot sue the defendant Commissioner in her official capacity under § 1983 for retrospective money damages because the Eleventh Amendment bars such a suit. The plaintiff's claims in this regard should therefore be dismissed.

## IV. MEETINGS BETWEEN CASE MANAGERS AND CLIENTS ARE NOT "BILLABLE VISITS" FOR WHICH THE PLAINTIFF IS ENTITLED TO BE COMPENSATED

Plaintiff alleges that, pursuant to 42 U.S.C. § 1396a(bb), it is entitled to be reimbursed for 100% of costs which are reasonable and related to the costs of furnishing services. Plaintiff further contends that it is entitled to be compensated for each and every client "visit", regardless of whether that "visit" was actually billable pursuant to federal or state law. The first issue that must be addressed is what actually constitutes a visit; the second is how is the FQHC per-visit rate is calculated; third, is whether a meeting with a "case manager" properly constitutes a visit for which the plaintiff is entitled to be reimbursed; and fourth, whether in this case the plaintiff was entitled to be reimbursed for the case manager's provision of psychotherapy.

### a. **What constitutes a visit**

42 U.S.C. § 1396a(bb) does not define the term "visit". The Code of Federal Regulations, Title 42 C.F.R. § 405.2463 defines a "visit" for purposes of services provided under Medicare as "a face-to-face encounter between a clinic or center patient and a physician, physician assistant, nurse practitioner, nurse-midwife, visiting nurse, qualified clinical psychologist or clinical social worker. There are no similar Federal regulations for Medicaid.

However, the new federal law regarding the prospective payment system required all states to amend their State Plan to reflect this change. 42 U.S.C. § 1396a(bb)(1). Under Conn. Gen. Stat. § 17b-10, when necessary to conform to a requirement of a joint federal/state program administered by the Department, the state may issue a policy while it is in the process of adopting it in regulation form. On March 29, 2001, the Department submitted State Plan Amendment 01-002 to the U.S. Department of Health & Human Services/Health Care Financing Administration (HCFA) (forerunner of CMS) pertaining to payments to FQHC's (Exhibit 1). On June 21, 2001, CMS formally approved the amendment and its attached addendum, Regs. Conn. State Agencies § 17b-262-661 to 17b-262-669 as being in conformity with the recently passed legislation regarding the implementation of the prospective payment system for payments to FQHC's (Exhibit 1).

Section 17b-262-661(4) states in pertinent part:

'Billable Service Visits' means a face-to-face encounter between the patient and health practitioner during which a primary health, mental health or dental service is rendered whether such encounter is billed or not.

The term "Primary Health Services" are further defined at subparagraph 13 as follows:

'Primary Health Services' means services of physicians, physicians' assistants, nurse practitioners, and other allied health professionals, for the ongoing, continuous or repetitive management of a patient's health care including services and supplies and the overall coordination of all services provided to the patient.

The Department's Medical Services Policy, Section 171.1 further defines the provision of mental health services. Section 171.1BI. states in pertinent part: "The clinic is staffed by physicians, psychiatrists, and allied health professionals who are directly involved in the facility's programs. The allied health professionals provide services under the direction of a physician, or psychiatrist who is a licensed practitioner performing within the scope of his/her

12

practice." Subparagraph B.II. states in pertinent part "[B]y or under the direction of a physician or psychiatrist" means "the mental health clinic's services may be provided by allied health professionals whether or not a physician or psychiatrist is physically present at the time that medical or medically-related services are provided. The physician or psychiatrist must: a. assume professional responsibility for the services provided; b. assure that the services are medically appropriate; c. need not be on the premises but must be readily available, meaning within fifteen minutes. Subparagraph B.III. states in pertinent part "an allied health professional or paraprofessional is an individual, employed in a clinic, who is qualified by special education and training, skills, and experience in providing mental health care and treatment. Services may be provided by, but not limited to, psychologists, psychiatric nurses, psychiatric social workers and mental health counselors."

Based upon the foregoing, "visits" involve encounters between clients/patients and health care practitioners (be they physicians, psychiatrists, psychologists, psychiatric nurses, psychiatric social workers or mental health counselors) wherein a number of services may be provided: initial evaluation (diagnostic); individual psychotherapy; group psychotherapy; family therapy; methadone maintenance treatment; or physical/neurological exams in connection with evaluation of mental illness. Medical Services Policy § 171.1CIII.E.. The provision of "case management" services does not constitute a "billable visit" entitling an FQHC to payment each time a client/patient meets with a case manager. Thus, it was proper for the Department to adjust the 1999-2000 audit to deduct for those per visit charges represented by encounters with case managers.

13